UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAWN WATTS,**

    **Plaintiff,**

    v.

**CREATIVE FOUNDATIONS, INC.,** *et al*.

    **Defendants.**

Civil Action 2:14-cv-01768
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Plaintiff, Dawn Watts ("Watts" or "Plaintiff"), brings this action against Defendants, Creative Foundations, Inc. ("CF") and David J. Robins ("Robins") (collectively "Defendants") alleging disability discrimination and failure to accommodate in violation of the Americans' with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. and Ohio Revised Code Chapter 4112. Plaintiff also asserts a state-law claim for breach of contract. This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (ECF No. 28), Plaintiff's Memorandum in Opposition to Defendants' Motion (ECF No. 33), and Defendants' Reply (ECF No. 35). For the reasons that follow, Defendants' Motion for Summary Judgment is **GRANTED**.

**I.**

CF is a corporation that provides various forms of support and services to individuals in the community with developmental disabilities. At the time of the alleged discrimination, Robins was the Executive Director of CF, Steve Fulton ("Fulton") was the Director of Operations for CF, Bruce Smith ("Smith") was Plaintiff's "job coach" provided by the Ohio Bureau of Vocational Rehabilitation, Trena Shank ("Shank") was an employee of Consumer

Support Services ("CSS"), a competitor of CF, where she served as a guardian to several deaf individuals who were receiving care from CF.

Plaintiff is a deaf person. Her first language is American Sign Language ("ASL"), in which she is fluent, and her second language is English. (Watts Dep. at p. 24, ECF No. 36-1.) She also suffers from a mild learning disability that affects her capacity to understand and process written English. *Id.* at p. 24–25. Plaintiff began her career at CF as a Team Leader in October of 2011 and worked until she was terminated June 6, 2013. (Robins Dep. at p. 6, 11, ECF No. 30; Watts Dep. at p. 126, ECF No. 36-1.) On February 8, 2012, Plaintiff was promoted to Supportive Living Coordinator where she worked in the administrative office and was supervised by Fulton. (Watts Dep. at p. 83, ECF No. 36-1.)

Prior to being hired, Plaintiff completed an employment application in which she indicated that she was fluent in English, ASL, and international gesture. (Watts Dep. at p. 49, ECF No. 36-1). She testified, however, that she does not consider herself fluent in English. *Id.* at 136. Plaintiff did not disclose on her employment application that she had any type of a mild learning disability which affected her ability to read or write in English. *Id.* at 50. According to Plaintiff, prior to beginning work, she told CF that she would need an ASL interpreter. *Id.* at 131. Plaintiff concedes, however, that prior to starting her job, nobody at CF told her that CF was planning to hire a full-time interpreter. *Id.* at 132. Although she indicates now that she wanted CF to provide her with full-time interpreter as an accommodation, according to management at CF, Plaintiff never made this request known.[1] (Robins Dep. at p. 39, 11, ECF

---

[1] Although the Court addresses the matter more fully *infra*, in her Declaration, Plaintiff indicates that she unequivocally told CF's Human Resources person, Kim Turner, that she needed a qualified interpreter in order to successfully perform her job duties and Ms. Turner told

2

No. 30).  Plaintiff testified she became aware that CF evaluated hiring a full-time interpreter, but human resources told her it was unreasonable because "CF just can't afford the interpreter just because of the rates that they would charge."  (Watts Dep. at 131-132.)  Plaintiff clearly testified that no one at CF ever told her that they were planning to hire a full-time interpreter.  *Id*. at 132.

As a Team Leader, Plaintiff was responsible for supervising services delivered to CF's clients according to each client's individual service plan.  (Defs' Mot. for Sum. Jdgmt., Exh. A, ECF No. 28.)  Some of these duties included supervising members of her team, making medical appointments for clients, and making sure all documentation was completed.  *Id.* Plaintiff received training on several subjects including her responsibilities.  During her training period, CF provided Plaintiff with a full-time interpreter.  (Watts Dep. at p. 73.)  Plaintiff averred that she did not have any difficulties understanding the training when an interpreter was present or when using the video phone.  *Id.* at 66.  Part of this training covered the confidential treatment of all information related to clients' personal and medical records.  Plaintiff understood that she was required to keep client information confidential.  *Id.* at 55.

During her time as a Team Leader, Plaintiff was supervised by Robins.  *Id.* at 75. She was able to effectively communicate with Robins regularly using text, e-mail, and sign language.  *Id.*

CF promoted Plaintiff to Supportive Living Coordinator on February 8, 2012.  She then became responsible for overall supervision of services delivered to clients according to their individual service plans.  (Exh. D, ECF No. 28).  Her new position required her to ensure all

---

her that someone fluent in ASL would be hired.  (Watts, D. Aff. ¶ 9.)   When asked during her prior deposition if she ever told CF she needed a full-time interpreter, Plaintiff, who then could not recall Kim's last name, said "I don't remember."  (Watts Dep. At 131:3-6.)

3

incident reports were complete and accurate, confirm that all individual service plans were in compliance, and bundle individual programming documentation on a monthly basis. *Id*. Plaintiff believed she was capable for performing the essential functions of this position. (Watts Dep. at p. 84, ECF No. 36-1). CF provided accommodations such as high speed internet for Plaintiff's video phone, fire alarms, smoke detectors, a flashing light to signal when someone came in the front door. *Id.* at 84–85.

During her time as Supportive Living Coordinator, Plaintiff used interpreters from various providers as well as other CF staff members. *Id.* at 85–87. When Plaintiff, in her discretion, required interpreters for meetings with her hearing team members, CF never denied this request. CF afforded Plaintiff latitude to call and request the interpreters when she needed one. *Id.* Robins encouraged Plaintiff to retain the services of an interpreter whenever she needed them. *Id.* at 89. While Plaintiff was personally concerned for the CF budget, she acknowledges that Robins never limited the use of interpreters. *Id.* at 90. Robins in fact relied heavily on Plaintiff's discretion as to whether or not she needed an interpreter for personnel meetings. CF postponed meetings on several occasions to accommodate a request for an interpreter. (Robins Dep. at p. 45, ECF No. 30)

On January 10, 2013, CF gave Plaintiff a written warning related to work-performance issues. (Watts Dep. at p. 80, ECF No. 36-1). The warning came because Plaintiff "failed to transfer medication that was prescribed by J.R.'s (individual) doctor for his eczema." (Exh. C, ECF No. 28.) According to the warning, Plaintiff did not properly document a prescription application correctly. When asked why the medicine was not on the Medication Administration Report ("MAR") or the medical record, Plaintiff said that the medication was not needed because

4

"he is getting better." (*Id*.)  The warning included a "Plan for Improvement," which required her to monitor all medications weekly on the MAR and directed Plaintiff never to make the determination on her own to discontinue medications.  (*Id*.)  Plaintiff's "job coach," Brue Smith, attended the meeting and interpreted.  Plaintiff indicated that she understood the Plan for Improvement.  (Watts Dep. at p. 96, ECF No. 36.)

On June 4, 2013, Plaintiff received a second written warning.[2]  (Def's Mot. for Summ. Jdgmt. Exh. E, ECF No. 28.)  Robins called an impromptu meeting.  Prior to starting the meeting, Robins asked Plaintiff if she wanted an interpreter present, which she declined.  (Watts Dep. at p. 99, ECF No. 36-1).  During this conversation, Fulton informed Plaintiff of several mistakes she committed including multiple billing errors, failing to review documentation at the end of the month to ensure correctness, and not properly complying to the incident-reporting procedure.  (*Id*.)  The attachment to the warning compiles numerous problems with Plaintiff's work, including billing, medication administration, communication with management, and insubordination.  CF presented her with another Plan of Improvement in the warning, which included that she was not allowed to have more than 3 billing errors, per individual, per month and that end-of-the-month documentation would be complete and orderly.  *Id*.  Plaintiff met with Robins, Fulton, and Janet Fout to discuss the warning.  Because Plaintiff had questions about the documents she was given during this meeting, the parties agreed to give her more time to review the documents and to reconvene on June 6, 2013.  *Id.* at 101.  Although she was aware that they planned to meet again, Plaintiff contends she did not read the documents until the afternoon of June 6, 2013, after she was terminated.  *Id.* at 106–07.

---

[2] The second warning was mislabeled as a final warning.

On June 2, 2013, Plaintiff attended an open house at the invitation of Trena Shank. Plaintiff told Shank that she was looking to leave CF. *Id.* at 116–17. On June 4, 2013, Robins, Fulton, and Shank had dinner together, at Shank's request, to discuss statements Plaintiff allegedly made to Shank at the open house. Shank provided Robins and Fulton with a detailed account of her conversation with Plaintiff. Fulton later wrote a statement regarding his recollection of the meeting with Shank. (Def's Mot. for Summ. Jdgmt., Exh. G.) According to the Fulton's account, Plaintiff told Shank that she was unhappy working for CF and that, if Shank's employer, CSS, were to hire her, she could bring three deaf individuals currently being served by CF. Shank indicated that Plaintiff mentioned these individuals by name. According to the statement, Shank was "shocked" by this information because she was the guardian of two of the individuals Plaintiff mentioned and had no intention of removing them from CF. (Defs' Mot. for Summ. Jdgmt., Exh. G, ECF No. 28; CF Dep. at p. 59–60, ECF No. 31). Plaintiff adamantly denies these allegations as false. (Watts Dep., at pp. 110-11, 118-19.) Plaintiff admitted, however, that if true, these allegations would amount to a breach of confidentiality and company policy, and would be grounds for termination. (*Id*. at at 110.)

After the meeting with Shank, Robins decided to terminate Plaintiff's employment based in part on the information he received from Shank and the work performance issues identified in the June 4th meeting. (CF Dep., at 61.) Around this time, Robins also noticed that Plaintiff was emptying out her office, and knew she was contemplating leaving CF. *Id*.

On June 6, 2013, Plaintiff met with Robins, Fulton and Fout to further discuss the issues raised during the June 4, 2013 meeting. (Watts Dep. at p. 108, ECF No. 36-1). Plaintiff did not make arrangements for an interpreter on that day. (*Id.* at 113.) The meeting, however, focused

on Plaintiff being terminated for breaking confidentiality related to sharing CF patient information with Trena Shank. (Robins Dep. at p. 76–78, ECF No. 30).

Plaintiff believes that she did not receive progressive discipline leading up to her termination. She asserts that since the CF handbook talks about progressive discipline, she should have received it for the matters raised in the June 4 and 6, 2013 meeting. (Watts Dep. at p. 140, ECF No. 36-1). The handbook, however, provides states that the company "reserves the right to skip any step and terminate a team member for any violation of company policy." (Def's Mot. for Summ. Jdgmt., Exh. M, ECF No. 28).

After she was terminated by CF on June 6, 2013, Plaintiff filed a charge with the Ohio Civil Rights Commission on that same day, alleging that CF terminated her because of her disability. Subsequently, Plaintiff filed the instant action asserting claims for (1) disability discrimination in violation of the ADA and O.R.C. Chapter 4112; (2) failure to accommodate in violation of the ADA and O.R.C. Chapter 4112; and (3) breach of contract.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, No. 10–3110, 2011 WL 4469612, at *3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

### III.

As an initial matter, the Court turns first to Defendants' assertion that the Watts' declarations are not properly before the Court. (Defs' Reply at p. 1-2, ECF No. 35.) Plaintiff submitted her own declaration and a declaration of her daughter with her Memorandum in Opposition to Defendants' Motion for Summary Judgment. Contrary to Defendants' assertions, an unsworn declaration may substitute for a conventional affidavit if the statement contained in the declaration is made under penalty of perjury and verified as true and correct. 28 U.S.C. § 1746. Here, the Watts' declarations are made under penalty of perjury and verified as true and accurate.

Nevertheless, if an affidavit is filed after a motion for summary judgment has been made "a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006). The nonmoving party is barred from avoiding summary judgment by filing an affidavit that directly contradicts the party's previous testimony. *Id.* "[A] party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself." *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 353 (6th Cir. 2013). As the Supreme Court in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), noted, federal courts

> [h]ave held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.

"[A] district court deciding admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the . . . party's prior sworn testimony." *Aerel*, 448 F. 3d at 908. An affidavit that is directly contradictory should be stricken unless the party "provides persuasive justification for the contradiction." *Id*. If there is no direct contradiction, "then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* The existence of a sham fact issue turns on "whether the affiant was cross-examined during his [or her] earlier testimony, whether the affiant had access to the pertinent evidence at the time of his [or her] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit

9

attempts to explain." *Id.*

In her declaration, Plaintiff largely repeats much of the information given during her sworn deposition. Several statements in her declaration, however, are wholly inconsistent with her prior sworn testimony during her deposition. In Paragraph 3 of her declaration, for instance, Plaintiff states that she "had to attend meetings to discuss important job performance issues without a qualified ASL interpreter present." (D. Watts Aff., ¶ 3, ECF No. 34.) This statement is not consistent with multiple statements she made during her deposition. On several occasions in her deposition, Plaintiff said that she attended meetings related to her performance without requesting an outside ASL interpreter because someone else fluent in ASL was there or she chose to not have an interpreter present.

In Paragraph 6, Plaintiff indicates that Defendant Robins "was upset because Bruce Smith attended the meeting" in January 2012 "to advocate for [her]." (*Id*. at ¶ 6.) During her deposition, however, Plaintiff stated that she had previously discussed with Robins having an interpreter at this meeting and they agreed that Smith would do so. (Watts Dep., at p. 81.)

In Paragraph 9 of her declaration, Plaintiff states that she "told CF's Human Resources person Kim Turner that I needed a qualified ASL interpreter in order to successfully perform [her] job duties." (*Id*. at ¶ 9.) Plaintiff avers that Ms. Turner told her someone fluent in ASL would be hired. (*Id*.) In her deposition, however, Plaintiff refers to a conversation with "Kim" from Human Resources but said that the HR person advised her that CF could not afford the interpreter. (Watts Dep., at p. 131.) She admitted in her deposition that no one from CF ever told her they were planning to hire a full-time ASL interpreter and stated under oath that she could not remember if she ever told CF that she needed a full-time interpreter. (Watts Dep. at

10

pp. 131, 132.)

In Paragraph 15, Plaintiff states that no qualified ASL interpreter attended the June 4, 2013 meeting. This statement is true, but it omits the fact that when offered an ASL interpreter by Robins, Plaintiff indicated she did not want one. During her deposition, Plaintiff stated unequivocally that "first, [Robins] said do you want an interpreter?" (Watts Dep. at p. 99.) Plaintiff indicated that she did not want one because she wanted to know what was going on right then. (*Id*.)

These subjects were probed in great depth during Plaintiff's deposition. These statements in her Declaration are wholly inconsistent with her previous sworn testimony and are apparent attempts to create an issue of material fact. Plaintiff has made no effort to provide a justification for any of the contradictions between her deposition and declaration. The Court, therefore, disregards the paragraphs in Plaintiff's Declaration that are contrary to her deposition testimony.[3]

### IV.

CF moves for summary judgment on Plaintiff's claim of disability discrimination and her breach of contract claim related to CF's purported failure to provide progressive discipline in violation of the employee handbook. Although Defendants moved for summary judgment on Plaintiff's breach of contract claim, she offers no mention of the claim or argument in opposition to the Motion for Summary Judgment. Plaintiff has, therefore, abandoned this claim. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff

---

[3] Brittany Watts' Declaration adds only that she was also employed at CF and sometimes served as an ASL interpreter there. (B. Watts Dec. at ¶¶ 10-15.) Nothing in Ms. Watts' Declaration creates a genuine issue of material fact.

11

fails to address it in response to a motion for summary judgment); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir.2006) (recognizing that failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim).

The Court therefore turns to Plaintiff's remaining claims regarding disability discrimination under the ADA and Ohio law.

**A.     Applicable Law**

Plaintiff alleges Defendants discriminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 and Ohio Revised Code § 4112.02 *et seq.*, by terminating her and for failing to provide her with a reasonable accommodation for her disability "to ensure Plaintiff was able to understand and participate in mandatory, unscheduled, impromptu job performance meetings." (Pl's Mem. Opp., at p. 1, ECF No. 33.) The Court of Appeals for the Sixth Circuit has held Ohio disability discrimination claims mirror the analysis for ADA claims. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 872 (6th Cir. 2007). An analysis under the ADA, therefore, applies equally to claims under O.R.C. Chapter 4112.

Under the ADA "employers are prohibited from discriminating against a qualified individual with a disability because of his or her disability in employment matters, such as hiring, advancement, and discharge." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 479 (6th Cir. 2012). A "qualified individual with a disability" is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that

such individual hold[.]" 42 U.S.C. § 12111(8). Under the ADA, "disability" means "a physical or mental impairment that substantially limits on or more major life activities" of a person. 42 U.S.C. § 12102(1)(A). "Major life activities" include hearing. 42 U.S.C. § 12102(2)(A). A person is "otherwise qualified" for a position when that person "can perform the essential functions[,]" or "fundamental job duties" of the position. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 985 (6th Cir. 2011). Plaintiff maintains that Defendants violated the ADA by failing to accommodate her disability and ultimately terminating her on account of her disability.

**B.     Failure to Accommodate**

Under the ADA, discrimination includes the failure to make reasonable accommodations for the known limitations of an employee with a disability. 42 U.S.C. §§ 12112(a), 12112(b)(5)(A). The Act defines "reasonable accommodation" as follows:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). A "reasonable accommodation" includes "the provision of qualified readers or interpreters." 42 U.S.C. § 12111(9)(B).

A plaintiff bringing an ADA claim for failure to accommodate "'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Kleiber*, 485 F.3d at 870 (quoting *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004)). "An employer, then, has the burden of persuasion to show that an accommodation would impose an undue hardship." *Hedrick*, 355 F.3d at 457. "In

13

order for an accommodation to be reasonable, it should be necessary in light of the plaintiff's known physical limitations." *Johnson v. Cleveland City School Dist.*, 344 Fed. App'x 104, 111 (6th Cir. 2009) (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008)). Furthermore, "[w]here there is more than one reasonable accommodation, the choice between accommodation is the employer's." *Smith v. Honda of America Mfg., Inc.*, 101 Fed. App'x 20, 25 (6th Cir. 2004); *see also Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) (quoting 29 C.F.R. pt. 1630, app. at 415) ("'[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.'"); *Trepka v. Bd. of Educ.,* 28 F. App'x 455, 459–60 (6th Cir. 2002) ("The employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the 'ultimate discretion' to choose another effective accommodation. . . . Accordingly, an employee is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided."). If an employee rejects a reasonable accommodation offered by her employer "that is necessary to enable the individual to perform the essential functions of the position, . . . the individual will not be considered a qualified individual with a disability." *Id.* at 801 (citing 29 C.F.R. § 1630.9(d)).

In satisfying her duty to propose a reasonable accommodation to her employer, a plaintiff must request the accommodation and provide either actual or constructive notice that the request is linked to a disability. Plaintiff must establish that she "requested and was denied" a reasonable accommodation. *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 786 (6th Cir. 2002); *see also Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 828 (S.D. Ohio 2004)

("A person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability."); *Russell v. National Amusements, Inc.*, No. 3:07-cv-3216, 2009 WL 262494, *13 (N.D. Ohio Feb. 4, 2009) ("By making this request, and linking it to an impairment, [plaintiff] sufficiently requested a 'reasonable accommodation.'"). An employer has no duty to provide a reasonable accommodation until an employee requests one. *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005) (finding no failure to accommodate when plaintiff remained silent). "Although 'an employee need not use the magic words, 'reasonable accommodation' or even 'disability,' the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions.'" *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 667 (S.D. Ohio 2013) (quoting *Leeds v. Potter*, 249 Fed. App'x 442, 449 (6th Cir. 2007)).

In the instant matter, the parties dispute whether Plaintiff was qualified for the position she held at CF. Defendants make a lengthy argument that she was not capable of performing the essential functions of her job as a Supportive Living Coordinator and that her termination had nothing to do with her disability, but instead resulted from her poor work performance and violating CF's confidentiality policy. While Plaintiff acknowledges Defendants' argument that she was terminated because of deficient job performance, Plaintiff utterly fails to offer any evidence in rebuttal. Instead, in her Memorandum in Opposition, Plaintiff makes a single assertion, namely that "Defendants are liable under the ADA because they failed to provide [her] with an ASL interpreter for unscheduled impromptu job performance meetings." (Pl's Mem. Opp., at p. 8.) This assertion is belied by the facts of the case. To the extent Plaintiff maintains

15

in this assertion that Defendants are liable under the ADA because they were required to provide an accommodation of a full-time staff interpreter, she never specifically requested it.

The law in this circuit is clear: "the employee is saddled with the burden of proposing an accommodation and proving that it is reasonable." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010). Here, Plaintiff cannot show that she made a request for a full-time interpreter, that the request was reasonable or that Defendants denied it. The record reflects that CF considered hiring a full-time interpreter but determined it was financially unreasonable to do so. (Robins Dep., at p. 38.) Defendants instead provided Plaintiff will unlimited access to interpretive services through Hallenross & Associates. Notably, Plaintiff herself recommended them. (Watts Dep., at 46.) Moreover, Robins encouraged Plaintiff to use an interpreter whenever she needed one. The record shows that meetings were delayed to permit an interpreter to attend. Plaintiff acknowledged that she knew it was her responsibility to secure an interpreter, not CF's, and that in emergency situations, she could contact a different interpreter service online. (Watts Dep., at p. 85.) Indeed, during the June 4, 2013 meeting that ultimately preceded her termination, Robins began by asking Plaintiff if she needed an interpreter. Plaintiff declined. (Watts Dep., at 99.) A disabled individual is not required to accept an accommodation offered by her employer but if she "rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified." 29 C.F.R. § 1630.9(d). Plaintiff did not propose a reasonable accommodation and rejected the precise accommodation she faults her employer for not supplying. Her claim for failure to accommodate under the ADA therefore fails

as a matter of law. *See, e.g.*, *Nance*, 527 F.3d at 459 (entering summary judgment for employer on reasonable accommodation claim when employee who did not propose an accommodation refused to perform machine-cleaner position with "crude[,]" though effective, tools recommended by physical therapist).

**C.     ADA Discriminatory Discharge**

Defendants contend that no genuine issues of material fact remain as to Plaintiff's claim that she was terminated on the basis of her disability in violation of the ADA. Again, Plaintiff fails to address this argument at all in her Memorandum in Opposition. The Court could, therefore, consider the claim abandoned. In any event, the Court determines that, to the extent she seeks to advance this claim, Defendants are entitled to judgment on it.

To establish a *prima facie* case of discriminatory discharge under the ADA, Plaintiff must show that (1) she is disabled, (2) she is qualified to perform the essential functions of the job; and (3) that CF took an adverse action against her, here termination, because of the disability. *Bailey v. Real Time Staffing Servs., Inc.*, 543 F. App'x 520, 522–23 (6th Cir. 2013) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998)). The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privilege of employment." 42 U.S.C. § 12112(a).

Because Plaintiff attempts to prove her claim of discriminatory discharge through circumstantial, as opposed to direct, evidence, she must use the familiar three-step burden-shifting framework of *McDonnell Douglas Corp. v.* Green, 411 U.S. 248 (1973). *See Jones v.*

17

*Potter*, 488 F.3d 397, 403 (6th Cir. 2007). The initial burden rests with Plaintiff to establish a *prima facie* case. *Id*. at 404. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "offer a legitimate explanation for its action." *Monette v. Elec. Data Sys*, 90 F.3d 1178, 1186 (6th Cir. 1996). If the defendant does so, the burden then shifts back to the plaintiff, who "must introduce evidence showing that the proffered explanation is pretextual." *Id*.; *see also Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016) (same).

Even assuming that Plaintiff could establish a *prima facie* case, Defendants have articulated a legitimate, nondiscriminatory reason for her termination. Defendants represent that they terminated Plaintiff based on poor work performance, including documentation, billing, and incident reporting errors, and ultimately on Robins' subjective belief that she had violated CF's confidentiality policy.

Because Defendants have articulated legitimate reasons for her termination, Plaintiff must prove that the reason "was simply a pretext designed to mask discrimination." *Jones*, 488 F.3d at 406. To carry this burden, Plaintiff must show by a preponderance of the evidence "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Id.* (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Although it is not apparent from her Memorandum in Opposition, Plaintiff seemingly argues that Defendants' justification for her discharge has no basis in fact. In Paragraph 19 of her declaration, Plaintiff declares that Robins learned shortly after he fired her that Shank lied about Plaintiff trying to take or steal clients away from CF. (Watts Dec. ¶ 19.) This argument fails for several reasons, not the least of which is Plaintiff has not demonstrated personal

18

knowledge as to this purported fact. Indeed, Robins testified during his deposition several years later that he still did not know whether Shank had been truthful. (Robins Dep., at p. 82.; Robins 30(b)(6) Dep., at p. 62.) Regardless, Robins made his decision to terminate Plaintiff based on her history of poor work performance as well as the information he received from Shank regarding Plaintiff allegedly sharing confidential information regarding CF's clients and her intention to take clients with her. Plaintiff has not come forward with any evidence that these reasons have no basis in fact, that they did not actually motivate her discharge, or that they were insufficient to motivate her discharge. Even drawing all inferences in her favor, as the Court must, Plaintiff has failed to adduce sufficient evidence to establish that a genuine issue of material fact remains for a jury. *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 251-52 (1986) (holding that the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.") Accordingly, her discriminatory discharge claim fails as a matter of law.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendants and to remove this case from the Court's pending cases list.

    **IT IS SO ORDERED.**


DATE: March 27, 2017        */s/ Elizabeth A. Preston Deavers*
    **ELIZABETH A. PRESTON DEAVERS**
    **UNITED STATES MAGISTRATE JUDGE**